UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IVAN A. SEVER,
     Plaintiff,

     v.                                 CIVIL ACTION NO.
                                           18-11482-MBB

CITY OF SALEM, MASSACHUSETTS,
     Defendant.

**MEMORANDUM AND ORDER RE:
DEFENDANT'S MOTION TO DISMISS
(DOCKET ENTRY # 19)**

**July 15, 2019**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to dismiss filed by defendant City of Salem ("defendant," "City of Salem," or "the City") to dismiss all five claims brought by plaintiff Ivan A. Sever ("plaintiff" or "Sever").[1] (Docket Entry # 19). After conducting a hearing, this court took the motion (Docket Entry # 19) under advisement.

PROCEDURAL BACKGROUND

---

[1] The amended complaint identifies defendant as a "municipal corporation organized under the laws of the Commonwealth of Massachusetts." (Docket Entry # 17, ¶ 5). The proposed class of defendants includes "[t]he Salem Department of Public Works . . . [which] is responsible for the maintenance of the City's public roads, and installation, repair, and maintenance of the City's traffic and speed limit signs" and "[t]he Salem Police Department . . . [which] is responsible for enforcement of laws and regulations, including motor vehicle speed limits." (Docket Entry # 17, ¶ 5(a)-(b)).

The amended complaint alleges the following five causes of action against the City:  (1) a "Massachusetts Statutory Violation" of section 18 of Massachusetts General Law chapter 90 ("chapter 90") for erection, maintenance, and enforcement of speed limit signs is ultra vires and therefore void (Count I); (2) a "Massachusetts Regulatory Standards Violation" of the "Procedures for Speed Zoning on State and Municipal Roads" for erection, maintenance, and enforcement of speed limit signs is ultra vires (Count II); (3) a "Massachusetts Regulatory Standards Violation" of "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices" for erection, maintenance, and enforcement of speed limits signs is ultra vires (Count III); (4) posting, threatening to enforce, and enforcing speed limit signs without regulatory authority in violation of the Due Process Clause of the Fourteenth Amendment under 42 U.S.C. § 1983 ("section 1983") (Count IV); and (5) a corresponding failure to adequately train, supervise, and discipline in violation of the Due Process Clause of the Fourteenth Amendment under section 1983 vis-à-vis the due process violation in Count IV (Count V).  (Docket Entry # 17).

The five claims in this action are similar to the claims in three previous actions brought or represented by plaintiff's counsel, Frederic Zotos, Esq. ("Zotos").  After unsuccessful attempts to obtain relief in state court, Zotos challenged the

legitimacy of speed limit signs in Hingham, Massachusetts in
<u>Zotos v. Town of Hingham, et al.</u>, Civil Action No. 12-11126-JGD
(D. Mass. Sept. 19, 2013) ("<u>Zotos I</u>"), and <u>Zotos v. Town of
Hingham, et al.</u>, Civil Action No. 13-13065-DJC (D. Mass. March
25, 2016) ("<u>Zotos II</u>").  He then represented a plaintiff
bringing similar claims in <u>Belezos v. Board of Selectman</u>, Civil
Action No. 17-12570-MBB (D. Mass. March 29, 2019) ("<u>Belezos</u>").
(Docket Entry # 20-7).  In an opinion on the merits, the court
in <u>Zotos I</u> rejected Zotos' claims and dismissed the action.
(Docket Entry # 20-4).  The First Circuit upheld the dismissal.
(Docket Entry # 20-5).  Zotos filed <u>Zotos II</u> prior to the First
Circuit's decision in <u>Zotos I</u>.  (Docket Entry # 20-6).  On March
25, 2016, the court in <u>Zotos II</u> issued a comprehensive opinion
and dismissed that action.  (Docket Entry # 20-6).  Finally,
this court dismissed the federal claims in <u>Belezos</u> in an opinion
dated March 29, 2019.  The state law claims and a motion to
certify a class remain pending adjudication in <u>Belezos</u>.

<u>STANDARD OF REVIEW</u>

The standard of review for a motion to dismiss under Fed.
R. Civ. P. 12(b)(6) ("Rule 12(b)(6)") motion is well
established.  To survive a Rule 12(b)(6) motion to dismiss, the
complaint must contain "enough facts to state a claim to relief
that is plausible on its face" even if "actual proof of [the]
facts is improbable."  <u>Bell Atlantic Corp v. Twombly</u>, 550 U.S.

544, 556, 570 (2007); Miller v. Town of Wenham, Mass., 833 F.3d
46, 51 (1st Cir. 2016).  The "standard is not akin to a
"probability requirement," but it "requires more than sheer
possibility that a defendant acted unlawfully."  Saldivar v.
Racine, 818 F.3d 14, 18 (1st Cir. 2016) (internal citations
omitted).  "Accepting as true all well-pleaded facts contained
in the complaint," the court "draw[s] all reasonable inferences
in the pleader's favor."  Sanders v. Phoenix Ins. Co., 843 F.3d
37, 42 (1st Cir. 2016).

     "Exhibits attached to the complaint are properly considered
part of the pleading 'for all purposes,' including Rule
12(b)(6)."  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.,
524 F.3d 315, 321 (1st Cir. 2008) (citations omitted).  This
court may also "consider matters of public record and facts
susceptible to judicial notice."  U.S. ex rel. Winkelman v. CVS
Caremark Corp., 827 F.3d 201, 208 (1st Cir. 2016).  It is
permissible, then, to "take judicial notice of proceedings in
other courts if those proceedings have relevance to the matters
at hand."  Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990);
see, e.g., Bluetarp Fin., Inc. v. Matrix Constr. Co., Inc., 709
F.3d 72, 78 (1st Cir. 2013) (taking judicial notice of related
state court cases).  Therefore, the Rule 12(b)(6) record
includes the state court pleadings and opinions regarding the

relevant cases attached to defendant's motion (Docket Entry # 19).

FACTUAL BACKGROUND

Succinctly stated, plaintiff alleges that the City improperly modified the speed limit ordinance for Swampscott Road and therefore lacks authority to enforce the speed limit signs posted there.  (Docket Entry # 17, ¶¶ 46-52).  The amended complaint quotes various Massachusetts speeding laws to support this claim.  It also quotes regulatory standards promulgated by the Massachusetts Department of Transportation Highway Division ("MassDOT Highway Division") pursuant to these laws.

I.   Massachusetts Speeding Laws and Regulations

The first law at issue is section two of Massachusetts General Laws chapter 85.  This law authorizes cities and towns to erect and maintain traffic signs in their jurisdiction. (Docket Entry # 17, ¶ 6).  It reads in pertinent part that "'speed control signs may be established only in accordance with the provisions of section eighteen of chapter ninety.'"  (Docket Entry # 17, ¶ 6) (quoting Mass. Gen. Laws ch. 85, § 2).

The other laws at issue are sections 17 and 18 of chapter 90 ("section 17" and "section 18").  "Section 17 sets forth the basic law [while] section 18 allows modifications to it." Hingham Police Dep't v. Zotos, 2012 WL 1689189, at *1 (Mass. App. Ct. May 16, 2012).  Section 17 provides in pertinent part:

> [1] No person operating a motor vehicle on any way shall run it at a rate of speed greater than is *reasonable and proper*, having regard to traffic and the use of the way and the safety of the public.  [2] Unless a way is *otherwise posted* in accordance with the provisions of section eighteen, it shall be *prima facie evidence* of a rate of speed greater than is reasonable and proper as aforesaid (1) if a motor vehicle is operated on a divided highway outside a thickly settled or business district at a rate of speed exceeding fifty miles per hour for a distance of a quarter of a mile, or (2) on any other way outside a thickly settled or business district at a rate of speed exceeding forty miles per hour for a distance of a quarter of a mile, or (3) inside a thickly settled or business district at a rate of speed exceeding thirty miles per hour for a distance of one-eighth of a mile, or (4) within a school zone which may be established by a city or town as provided in section two of chapter eighty-five at a rate of speed exceeding twenty miles per hour. . . .  [4] If a speed limit has been duly established upon any way, in accordance with the provisions of said section, operation of a motor vehicle at a rate of speed in excess of such limit shall be *prima facie evidence* that such speed is greater than is reasonable and proper.

(Docket Entry # 17, ¶ 11) (quoting section 17).  Furthermore, Massachusetts General Laws chapter 90 ("chapter 90"), section 17C ("section 17C"), provides in pertinent part that a city council "that accepts this section . . . may, . . . without further authority, establish a speed limit of 25 miles per hour on any roadway inside a thickly settled or business district[2] in the city or town on any way that is not a state highway." (Docket Entry # 17, ¶ 13) (citing section 17C).

---

[2]  Section one of chapter 90 provides a definition for "thickly settled or business districts."

"In contrast, G.L. c. 90, § 18, permits the imposition of a different speed limit so long as certain procedures are followed." <u>Hingham Police Dep't</u>, 2012 WL 1689189, at *1.  It states in pertinent part that "'[n]o such Special Speed Regulation shall be effective until there shall have been erected . . . signs, conforming to standards adopted by the department,[3] setting forth the speed or other restrictions established by the regulation.'"  (Docket Entry # 17, ¶ 7) (quoting section 18).

Based on the enabling authority in section 18, the MassDOT Highway Division promulgated regulatory standards entitled "Procedures for Speed Zoning on State and Municipal Roadways" ("MassDOT Roadway Procedures") (Docket Entry # 17, ¶ 8) (Docket Entry # 17-1).  With respect to the laws governing speed regulations, it states in pertinent part:

> Sections 17, 17A, 17C, 18, and 18B of Chapter 90 of the Massachusetts General Laws (MGL) govern speed limits on all streets and highways throughout the Commonwealth . . ..  In addition, MassDOT and all municipalities are required by MGL § 2 to conform to the *Manual on Uniform Traffic Control Devices* (MUTCD) for the posting of all regulatory and warning signage, including speed limit signs, on all streets and highways.

(Docket Entry # 17, ¶ 8(a)) (Docket Entry # 17-1, p. 1).  With respect to the classification of speed limits, it states in

---

[3]  "Department" is defined for purposes of chapter 90 as "the division of highways."  Mass Gen. Laws ch. 90, § 1.

pertinent part:

> Under satisfactory operating conditions, speed limits can
> be classified into two different categories: regulatory
> (posted) speed limits and statutory (unposted, with some
> exceptions) speed limits.  MGL c. 90 §§ 18 and 18B
> establish the requirements for posting regulatory speed
> limits.  MGL c. 90 §§ 17, 17A, and 17C cover the criteria
> for statutory speed limits.

(Docket Entry # 17, ¶ 8(b)) (quoting Docket Entry # 17-1, pp.

2).  Finally, with respect to regulatory speed limits, the

MassDOT Roadway Procedures states in pertinent part:

> "A regulatory speed limit is one that has completed a
> thorough traffic engineering study, has a Special Speed
> Regulation that has been signed by the roadway owner, the
> Registry of Motor Vehicles, and the MassDOT Traffic &
> Safety Engineering Section, and has the appropriate
> numerical speed limit signage erected to clearly define the
> special speed zones. . . . With exception to Safety Zones
> as noted in Section 9.c, <u>the establishment of a regulatory
> speed limit must follow this procedure or it is in
> violation of MGL c. 90 § 18 and is therefore considered
> unenforceable.</u>"

(Docket Entry # 17, ¶ 8(c)) (emphasis in original) (quoting

Docket Entry # 17-1, p. 2).

The MassDOT Highway Division also promulgated regulatory

standards entitled "The Massachusetts Amendments to the 2009

Manual on Uniform Traffic Control Devices" ("MassDOT Manual")

(Docket Entry # 17, ¶ 10) (Docket Entry # 17-2).  This explains

the "85-percentile method" and the process for a city or town to

erect an enforceable regulatory speed limit sign under section

18:

> <u>Section 10A-8</u> Speed Control:

"Of the special regulations adopted by municipalities under the provisions of Chapter 90, Section 18 of the General Laws, the most commonly used is the special regulation of the speed of motor vehicles. Considerable data including speed observations and trial runs must be obtained by municipal officials, usually the Police Department. *The final determination is based upon the 85-percentile method, which is that speed at or below which 85% of the vehicles observed were actually traveling.* . . .

Procedures for Establishment of Legal Speed Zones

(1)   The municipality is to conduct proper studies and submit data to the Department. . . .

(2)   After the speed zones, proposed by the local authorities, are reviewed by the Department, they are returned to the municipality for formal adoption by the rule-making body.  During this time, the municipality is responsible for any and all hearings required for adoption.

(3)   Upon receipt of notice of formal adoption by the municipality, the Department, acting jointly with the Registry, will certify and approve.

(4)   Certified regulation is returned to municipality.

(5)   Official Speed Limit signs may then be installed in accordance with the specific provisions of the approved speed regulation.

(6)   The Special Speed Regulation is then enforceable against violators."

(Docket Entry # 17, ¶ 10) (quoting Docket Entry # 17-2).

II.   <u>Present Litigation</u>

Swampscott Road, located in Salem, falls under the

jurisdiction of the City of Salem and is not a state highway.

(Docketed Entry # 17, ¶ 16).  In 1975, the City Council of Salem

adopted Special Speed Regulation No. 1042 in accordance with the

provisions of section 18.  (Docket Entry # 17, ¶ 17) (Docket
Entry # 17-4) ("Regulation No. 1042").  This established speed
limits for zones along Swampscott Road.  (Docket Entry # 17, ¶
17(a)-(d)).  In accordance with Regulation No. 1042, the City
erected speed limit signs on Swampscott Road at the beginning of
each zone and maintained them through late 2017.  (Docket Entry
# 17, ¶ 18).  They displayed speed limits ranging between 30
m.p.h. and 40 m.p.h. along Swampscott Road eastbound and between
25 m.p.h. and 40 m.p.h. along Swampscott Road westbound.
(Docket Entry # 17, ¶ 18(a)-(b)).

On March 9, 2017, the City Council of Salem accepted
section 17C, establishing a speed limit of 25 m.p.h. on any
roadway inside a thickly settled or business district in the
City on any way that is not a state highway.  (Docket Entry #
17, ¶ 19).  The Mayor of Salem approved the order on March 13,
2017 (Docket Entry # 17, ¶ 19) (Docket Entry # 17-5), and the
City Clerk notified the MassDOT Highway Division about the "City
of Salem Adoption of 25 Miles Per Hour Speed Limit."  (Docket
Entry # 17, ¶ 20) (Docket Entry # 17-6).

On July 31, 2017, the City Council of Salem repealed
Special Regulation No. 1042.  (Docket Entry # 17, ¶ 22) (Docket
Entry # 17-7).  Swampscott Road allegedly does not meet the
definition of a "roadway inside a thickly settled or business
district" pursuant to section one of chapter 90, for which

section 17C would impose a statutory speed limit of 25 m.p.h..
(Docket Entry # 17, ¶ 23).   Instead, Swampscott Road is
allegedly an "undivided highway outside a thickly settled or
business district" pursuant to section 17(2). (Docket # 17, ¶
24).   Therefore, its alleged statutory speed limit in the
absence of any special speed regulation is 40 m.p.h..  (Docket
Entry # 17, ¶ 24).   After repealing Special Regulation No. 1042,
however, the City removed all speed limit signs greater than 25
m.p.h. on Swampscott Road and replaced them with 25 m.p.h.
signs.  (Docket Entry # 17, ¶ 25).

     Plaintiff resides at 25 Ingalls Terrace in Swampscott.
(Docket Entry # 17, ¶ 4).   Like many others, he regularly drives
his automobile on Swampscott Road to travel to and from both
Route 128 and the Route 107 business district.  (Docket Entry #
17, ¶ 27-28).

     In late October 2017, he noticed the removal of the 30, 35,
and 40 m.p.h. speed limit signs and their replacement with 25
m.p.h. signs.  (Docket Entry # 17, ¶ 30).   He raised concerns
about this change with several city officials.  On January 9,
2018, he wrote to David Knowlton ("Knowlton"), city engineer and
interim director of public works, stating in pertinent part:

> [T]he only legal way to change a posted speed limit is to
> conduct a new traffic study (assuming one was done in the
> first place) in accordance with the federal MUTCD
> guidelines, and seeking approval from MASSDOT.  City
> Council cannot simply repeal an established, posted speed

limit. . . . I urge you to reset the speed limits on
Swampscott Rd to the previous and presumably legal values.

(Docket Entry # 17, ¶ 31) (Docket Entry # 17-8).  Knowlton

responded that plaintiff was "correct that the limits wil [sic]

likely return to previous speeds."  (Docket Entry # 17-8).  On

May 17, 2018, plaintiff wrote a similar message to Nicholas

Downing ("Downing"), acting director of traffic and parking.

(Docket Entry # 17, ¶ 33) (Docket Entry # 17-9).  Downing's

response on May 21 informed plaintiff that "[w]hen the City

adopted a City-wide speed limit of 25 mph, we knew certain roads

would not fall into that category, including this section of

Swampscott Road."  (Docket Entry # 17, ¶ 34) (Docket Entry # 17-

9).  Although Downing stated that he was working to reverse the

change (Docket Entry # 17-9), the disputed 25 m.p.h. signs

remained posted when plaintiff filed this action on July 17,

2018.  (Docket Entry # 17, ¶ 35).  Less than a month later,

plaintiff observed the removal of the signs and their

replacement with 30, 35, and 40 m.p.h. signs.  (Docket Entry #

17, ¶ 45).  However, the City allegedly made this change without

re-enacting Special Speed Regulation No. 1042.  (Docket Entry #

17, ¶ 51).

    Plaintiff believes that the statutory speed limit on

Swampscott Road in the absence of any special speed regulation

is 40 m.p.h..  (Docket Entry # 17, 36).  Accordingly, and

despite the presence of the disputed 25 m.p.h. speed limit signs, he generally chose to drive at or below 40 m.p.h. on Swampscott Road, conditions permitting.  (Docket Entry # 17, ¶ 37).  When he observed police patrols, he generally slowed down to comply with the 25 m.p.h. speed limit signs to avoid being stopped and ticketed.  (Docket Entry # 17, ¶ 38).  On or about July 20, 2018, for example, he slowed down when he observed a Salem police officer engaged in a traffic stop on Swampscott Road. (Docket Entry # 17, ¶ 39).

Salem police enforce speed limit signs, including those at issue on Swampscott Road.  (Docket Entry # 17, ¶ 40).  On February 25, 2008, the *Salem News* newspaper published an article about the City's "ongoing crackdown on speeding and aggressive drivers."  (Docket Entry # 17, ¶ 41) (Docket Entry # 17-10). Similarly, the *Salem Gazette* newspaper published an article about the City's "Go Fast, Get Fined" campaign on January 21, 2011.  (Docket Entry # 17, ¶ 42) (Docket Entry # 17-11). Finally, on May 7, 2012, WBZ radio station reported that Salem police had issued hundreds of speeding tickets pursuant to speed limit signs that had been posted without the requisite traffic engineering studies.  (Docket Entry # 17, ¶ 43) (Docket Entry # 17-12).  The City acknowledged that the tickets were not legal, while Salem police explained that "they [were] just enforcing signs posted by the state."  (Docket Entry # 17-12).

DISCUSSION

Defendant moves to dismiss all five counts on the grounds of standing and the merits.  (Docket Entry # 19).  Plaintiff opposes dismissal.  (Docket Entry # 23).

A.  Standing

Defendant argues that plaintiff lacks standing because "he has suffered no injury in fact, any potential injury he suffered was not caused by the challenged action, and a favorable resolution of his claim would not redress the alleged injury." (Docket Entry # 20).  Plaintiff "bases his standing on a theory of enhanced risk of future injury from unreasonable seizure" that defendant caused by enforcing the disputed speed limit signs without regulatory authority.  (Docket Entry # 23, p. 7).

Article III provides the judicial branch with the power to settle only "cases" or "controversies."  U.S. Const. art. III, § 2.  "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish they have standing to sue.'" Blum v. Holder, 744 F.3d 790, 795 (1st Cir. 2014) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013)).  "This requirement is 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" Id. at 795-96 (quoting Summers v. Earth Island Inst., 555 U.S. 488, 492-93 (2009)).  "In keeping with the purpose of this doctrine, 'our standing inquiry has been especially rigorous

when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches . . . was unconstitutional.'" Clapper, 568 U.S. at 408 (brackets omitted) (quoting Raines v. Byrd, 521 U.S. 811, 819-20 (1997)). To establish standing, "plaintiff must show that he or she has a personal stake in the litigation's outcome by 'establishing each part of a familiar triad: injury, causation, and redressability.'" Wilson v. HSBC Mortgage Services, Inc., 744 F.3d 1, 8 (1st Cir. 2014) (brackets omitted) (quoting Culhane v. Aurora Loan Servs. of Neb., 708 F.3d 282, 289 (1st Cir. 2013)). Standing also has "a prudential component." Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 637 (1st Cir. 2013).

Turning to the first element, injury requires "an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.'" Kerin v. Titeflex Corp., 770 F.3d 978, 981 (1st Cir. 2014) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." Blum, 744 F.3d at 796 (emphasis in original) (quoting Clapper, 568 U.S. at 409). "'Allegations of

*possible* future injury' are not sufficient." Id. (emphasis in original) (brackets omitted) (quoting Clapper, 568 U.S. at 409).

Kerin addressed "the question of standing based on a theory of enhanced risk of future injury."[4] 770 F.3 at 979.  As explained by the First Circuit in Kerin:

> Cases claiming standing based on risk . . . potentially involve two injuries: (1) a possible future injury that may or may not happen (i.e., the harm threatened); and (2) a present injury that is the cost or inconvenience created by the increased risk of the first, future injury (e.g., the cost of mitigation).  These cases require caution, because although one of the alleged injuries is present, satisfying imminence, that injury may still be speculative.  This is because the alleged present injury depends on the *plaintiff's* response to an increased risk, and whether his or her response constitutes a reaction for which compensation is owed or constitutes a mere attempt to "manufacture standing."  For this reason, cases claiming standing based on risk fall in at least two categories.
>
> In the first, where standing is more frequently found, the present injury is linked to a statute or regulation . . . that allegedly has been or will soon be violated.  Cases in this first category are easier, in part because the legislative and executive agencies—the branches tasked with evaluating risks and developing safety standards—have already identified the risk as injurious.
>
> In the second category, the present injury has not been identified and so is entirely dependent on the alleged risk of future injury.  Cases falling into this second category require greater caution and scrutiny because the assessment

---

[4]  Plaintiff relies on outdated, out-of-circuit precedent to claim that courts "have generally recognized that threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing purposes."  (Docket Entry # 23, pp. 7) (quoting Baur v. Veneman, 352 F.3d 625, 633 (2d Cir. 2003)).  To the contrary, the First Circuit's more recent "survey of the case law reveals that the treatment of enhanced risk claims is in a state of flux."  See Kerin, 770 at 980 n.1 (collecting cases).

> of risk is both less certain, and whether the risk
> constitutes injury is likely to be more controversial.
>
> Indeed, not all risks constitute injury.  As the D.C.
> Circuit has noted, "were all purely speculative 'increased
> risks' deemed injurious, the entire requirement of 'actual
> or imminent injury' would be rendered moot, because all
> hypothesized, non-imminent 'injuries' could be dressed up
> as 'increased risk of future injury.'"  Ctr. for Law &
> Educ. v. Dep't of Educ., 396 F.3d 1152, 1161 (D.C. Cir.
> 2005).

Id. at 981–83 (citations omitted).  Furthermore, "[a]llegations

of a subjective 'chill' are not an adequate substitute for a

claim of a specific present objective harm or a threat of a

specific future harm."  Blum, 744 F.3d at 796 (quoting Laird v.

Tatum, 408 U.S. 1, 13–14 (1972)).

The First Circuit in Reddy v. Foster further explains that

"[i]n certain circumstances, 'the threatened enforcement of a

law' may suffice as an 'imminent' Article III injury."  845 F.3d

493, 500 (1st Cir. 2017) (quoting Susan B. Anthony List v.

Driehaus, 573 U.S. 149, 158 (2014)).  This type of injury "is

imminent if it is certainly impending or if there is a

substantial risk that harm will occur."[5]  Id. (emphasis in

---

[5]  The Court in Clapper notes that it sometimes did not require
"plaintiffs to demonstrate that it is literally certain that the
harms they identify will come about.  In some instances, we have
found standing based on a 'substantial risk' that the harm will
occur, which may prompt plaintiffs to reasonably incur costs to
mitigate or avoid that harm."  568 U.S. at 414, n.5 (collecting
cases).  It left open whether the "substantial risk" standard
"is relevant and distinct from the 'clearly impending'
requirement."  See id.  It seemingly merged the standards in
Driehaus, stating that "[a]n allegation of future injury may

original).  "But if a future injury is '"too speculative for

Article III purposes" and no prosecution is even close to

impending,' then there is no standing to sue."[6]  Id. (quoting

Blum, 744 F.3d at 799).  To "assess[] the risk of prosecution,"

the First Circuit explains that:

> Weight must be given to the lack of a history of
> enforcement of the challenged statute to like facts, that
> no enforcement has been threatened as to plaintiffs'
> proposed activities.  Particular weight must be given to
> the Government's disavowal of the statute and its rejection
> of plaintiffs' interpretation as unreasonable.

Blum, 744 F.3d at 798.  The latter criteria is satisfied only if

the government clearly disavows its interest in prosecution.

See id. (collecting cases).

    In the case at bar, plaintiff claims that "Salem's official

conduct of enforcing speed limit signs which it knew were

unauthorized under state law, violates his Fourteenth Amendment

---

suffice if the threatened injury is 'certainly impending,' or
there is a '"substantial risk" that the harm will occur.'"  573
U.S. at 158 (quoting Clapper, 568 U.S. at 414, n.5).
[6]  Plaintiff cites pre-Clapper precedent to argue that "'courts
will assume a credible threat of prosecution in the absence of
compelling contrary evidence'" and that the "'credible threat of
prosecution' standard is 'quite forgiving.'"  (Docket Entry # 23,
pp. 8-9) (quoting New Hampshire Right to Life Political Action
Committee v. Gardner, 99 F.3d 8, 14-15 (1996)).  These
assertions are irreconcilable with the First Circuit's recent
statements in Reddy and Blum.  Indeed, the First Circuit in Blum
notes that Clapper superseded parts of its standing
jurisprudence.  See Blum, 744 F.3d at 798 ("[b]efore the
decision in Clapper, this circuit applied an 'objectively
reasonable' fear of prosecution injury standard'") (collecting
cases, including N.H. Right to Life).

right to liberty, i.e., to be free from unreasonable seizure and physical restraint." (Docket Entry # 23, pp. 5-6). Thus, he "bases his standing on a theory of enhanced risk of future injury from unreasonable seizure." (Docket Entry # 23, p. 7). In addition to this future risk, plaintiff identifies a present injury in the "chilling effect" that causes him to slow down when he sees police officers while driving on Swampscott Road. (Docket Entry # 23, pp. 7-8) (Docket Entry # 17, ¶ 38).

Plaintiff first argues that the disputed speed limit signs cause him to suffer an enhanced risk of future injury from unreasonable seizure.[7] An initial question is whether this case is one where "the present injury is linked to a statute or regulation . . . that allegedly has been or will soon be violated." Kerin, 770 F.3d at 982. Standing is "more frequently found" in these cases. Id. On the surface, it appears to be so; plaintiff argues that his injury "can be traced to the existence and threatened enforcement of the challenged regulatory speed limit signs." (Docket Entry # 23,

---

[7] Plaintiff's claim that a traffic stop pursuant to the disputed speed limit signs would be an unreasonable seizure is a "legal conclusion" that this court need not accept as true when considering a motion to dismiss. See Maldonado v. Fontanes, 568 263, 268 (1st Cir. 2009). However, this claim is more appropriately evaluated alongside plaintiff's substantive due process claims. For this standing inquiry, then, this court will temporarily accept this conclusion.

p. 10).  However, <u>Kerin</u> explains that these cases are "easier"
because "the legislature and executive agencies . . . have
already identified the risk as injurious."  <u>Id.</u>  The relevant
speeding laws and regulations exist to promote public safety.
<u>See</u>, <u>e.g.</u>, (Docket Entry # 17-1, p. 4) ("[Speed] zone[s] should
be established to increase safety for all road users.").  Thus,
the risk that plaintiff identifies—unreasonable seizures—is not
the same *type* of injury.  <u>See</u> <u>Kerin</u>, 770 F.3d at 982 (explaining
need for "'tight connection between the type of injury . . .
allege[d] and the fundamental goals of the statutes . . . sue[d]
under'") (quoting <u>Baur</u>, 352 F.3d at 635).[8]  Therefore, the
alleged violations of state speeding laws and regulations do not
supply the type of connection to plaintiff's claimed injury that
relaxes the standing inquiry under <u>Kerin</u>.

With respect to plaintiff's argument, enhanced risk of
unreasonable seizure will satisfy imminence only if it "is
certainly impending <u>or</u> if there is a substantial risk that harm
will occur."  <u>Reddy</u>, 845 F.3d at 500 (emphasis in original).

---

[8]  <u>Baur</u> discusses this "tight connection" in the context of a
food-safety suit, where a consumer-plaintiff alleged that USDA
policies allowing the sale of meat with an elevated risk of mad
cow disease injured him by exposing him to an increased risk of
disease transmission.  352 F.3d at 632-36.  The court explains
that this connection existed because "the very purpose of the
FMIA and the FFDCA, the statutes which [plaintiff] alleges the
USDA has violated, is to ensure the safety of the nation's food
supply and to minimize the risk to public health from
potentially dangerous food and drug products."  <u>See</u> <u>id.</u> at 634.

For this analysis, Blum states that "[w]eight must be given to the lack of enforcement of the challenged statute to like facts." 744 F.3d at 799. It is relevant, then, that the City issued speeding tickets pursuant to invalid speed limit signs between 2010 and 2011. (Docket Entry # 17-12). However, Blum also states that "*[p]articular* weight must be given to the Government's disavowal of the statute and its rejection of plaintiffs' interpretation as unreasonable." 744 F.3d at 799 (emphasis added). Here, multiple authorities confirmed that the disputed 25 m.p.h. signs were unenforceable. Knowlton, the city engineer and interim director of public works, told plaintiff that he was "correct that the limits wil [sic] likely return to previous speeds." (Docket Entry # 17-8). Downing, the acting director of traffic and parking, states this even more clearly: "When the City adopted a City-wide speed limit of 25 mph, we knew certain roads would not fall into that category, including this section of Swampscott Road." (Docket Entry 17-9). He expressly confirmed that that the City was working to "*make sure the correct, accurate signage is posted*." (Docket Entry # 17-9) (emphasis added). These statements can be read only as "disavow[ing]" the disputed signs and, consequently, any intention to enforce them. See Blum, 744 F.3d at 799. The fact that the City mistakenly enforced unauthorized speed limit signs between 2010 and 2011 adds weight to this interpretation (Docket

Entry # 17-12) because its officials would understand the risk of illegal speeding tickets.  Thus, a traffic stop pursuant to the disputed signs does not appear to have been "certainly impending," nor was there a "substantial risk that harm would occur."  Reddy, 845 F.3d at 500.

Common sense points towards this conclusion as well.  Such a stop would require for:  (1) plaintiff to travel in excess of the disputed speed limit signs; (2) on Swampscott Road; (3) while observed by a Salem police officer; (4) who is unaware that several officials disavowed the disputed signs; (5) who then decides to execute a stop.  Such a "speculative chain of possibilities does not establish that [plaintiff's] injury is certainly impending."  Clapper, 568 U.S. at 410.  Instead, it establishes a mere possibility of prosecution; however, "'[a]llegations of *possible* future injury' are not sufficient."  Blum, 744 F.3d at 796 (emphasis in original) (quoting Clapper, 568 U.S. at 409).  Moreover, the Supreme Court in Clapper cautions that "we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."  568 U.S. at 413.

Plaintiff also claims injury in the "daily dilemma" he faces concerning the proper speed limit (Docket Entry # 23, p. 2) and a "chilling effect" that causes him to slow when he sees police.  (Docket Entry # 23, p. 7).  In other words, he asserts

to be "suffering *present* injury" because of inconveniences associated with the future risk.  Clapper, 568 U.S. at 402 (emphasis in original).  This "improperly waters down the fundamental requirements of Article III."  Id. at 416. Plaintiffs cannot "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending."  Id.; see also Blum, 744 F.3d at 797 ("It is not enough . . . to allege a subjective fear of injurious government action, even if that subjective fear is 'not fanciful, irrational, or clearly unreasonable.'") (quoting Clapper, 568 U.S. at 417).

Plaintiff's evidence of his future risk is unavailing. First, plaintiff argues that although standing "'is assessed as of the time the lawsuit is brought,' post-filing filing events may confirm that a plaintiff's fear of future harm is reasonable," Baur, 352 F.3d at 633, and points out that he "photographed a Salem police traffic stop on Swampscott Road" three days after filing this action.  (Docket Entry # 23, p. 9). However, there is no reason to infer that this stop occurred because of the disputed signs beyond pure speculation.

Second, Salem's anti-speeding campaign does not suggest that he "remained under the credible threat of enforcement, seizure, and prosecution" even if the campaign is presumed to be ongoing.  (Docket Entry # 17, p. 9).  As discussed, several

officials confirmed that the disputed signs were unenforceable
after plaintiff raised the issue, which evidences that the City
ceased its plans to enforce them.  Furthermore, the City
replaced the disputed 25 m.p.h. speed limit signs with 30, 35,
and 40 m.p.h. signs after plaintiff filed this action.  (Docket
Entry # 17, ¶ 45).  Even if these latest signs are invalid
because the City did not re-enact Special Speed Regulation No.
1042 (Docket Entry # 17, ¶ 51), the City's enforcement of these
signs is still unlikely to cause plaintiff to be subject to a
traffic stop.  In other words, if a traffic stop was not
imminent when the signs read 25 m.p.h., then it is certainly not
imminent when they read 30, 35, and 40 m.p.h..

In short, plaintiff's "future injury is '"too speculative
for Article III purposes" and no prosecution is even close to
impending.'"  Reddy, 845 F.3d at 500 (quoting Blum, 744 F.3d at
799).  That leaves plaintiff with only a "subjective 'chill,'"
which is insufficient to establish standing.  See Blum, 744 F.3d
at 796 (quoting Laird, 408 U.S. at 13-14).  Because plaintiff
fails to allege a legally cognizable injury, it is unnecessary
to discuss other issues of causation, redressability, and
prudence.  Due to the lack of standing, the dismissal is without
prejudice.  See Hochendoner v. Genzyme Corp., 823 F.3d 724, 736
(1st Cir. 2016) ("dismissed for lack of Article III standing
must operate without prejudice").  In light of the lack of

Article III standing, there is no need to address defendants' alternative arguments to dismiss the claims on the merits.  See generally Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 101 (1998).

## CONCLUSION

In accordance with the foregoing discussion, the motion to dismiss (Docket Entry # 19) is **ALLOWED** with respect to all of plaintiff's claims for lack of standing and the complaint is therefore dismissed without prejudice.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge